FILED by **KZ** D.C.
ELECTRONIC
Sep 6, 2011
STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. **11-80157-CR-RYSKAMP/HOPKINS**

18 U.S.C. § 1349

UNITED STATES OF AMERICA,

        Plaintiff,

v.

WENSLEY ROBIN MCFARLANE,
   a/k/a "Collin Finnigan,"
JAMES MICHAEL TOMASSO,
   a/k/a "Jimmy Johnson,"
   a/k/a "James Michaels,"
   a/k/a "William Davis," and
NICHOLAS CHARLES HIGGINS,
   a/k/a "Jordan Markum,"
   a/k/a "Nicky Blue,"

        Defendants.
_____/

## INFORMATION

The United States Attorney charges that:

### COUNT 1
(Conspiracy to Commit Mail and Wire Fraud: 18 U.S.C. § 1349)

1. From on or about December 17, 2008 through on or about March 30, 2010, the exact dates being unknown to the United States Attorney, in Boca Raton, Palm Beach County, in the Southern District of Florida, and elsewhere, the defendants,

WENSLEY ROBIN MCFARLANE,
   a/k/a "Collin Finnigan,"
JAMES MICHAEL TOMASSO,
   a/k/a "Jimmy Johnson,"
   a/k/a "James Michaels,"
   a/k/a "William Davis," and
NICHOLAS CHARLES HIGGINS,

a/k/a "Jordan Markum,"
"a/k/a "Nicky Blue,"

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with each other and with persons known and unknown to the United States Attorney to commit certain offenses against the United States, that is:

    a. to knowingly and with intent to defraud, devise, and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and knowingly causing to be delivered certain mail matter by the U.S. Postal Service and by private and commercial interstate carrier, according to the directions thereon, for the purpose of executing the scheme, in violation of Title 18, United States Code, Section 1341; and

    b. to knowingly and with intent to defraud, devise, and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and knowingly transmitting and causing to be transmitted certain wire communications in interstate and foreign commence, for the purpose of executing the scheme, in violation of Title 18, United States Code, Section 1343.

## PURPOSE AND OBJECT OF THE CONSPIRACY

    2. It was the purpose and object of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves and others by seeking to obtain millions of dollars in advanced fees from timeshare owners across the United States in connection with the purported purchase of their timeshares by the conspirators, which sales never occurred and were never intended

to occur.

## MANNER AND MEANS OF EXECUTING THE SCHEME

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

3. Between December 17, 2008, and March 30, 2010, co-conspirators T.M.O. and F.D. organized a boiler room which solicited advanced fees from timeshare owners in connection with the purported purchase of their timeshares. T.M.O. would frequently change the corporate name under which the boiler room operated in order to avoid law enforcement scrutiny and to hamper consumer complaints. Although operating under different corporate names, the boiler room was at all times under the control of T.M.O. and F.D. and operated by them out of a single office which was initially located in Boynton Beach, Florida, and then Boca Raton, Florida.

4. From the beginning of the conspiracy, T.M.O., F.D. and other co-conspirators caused the hiring of telemarketers to function as "openers" or "fronters" for the scheme. Using lead sheets which identified timeshare owners and their properties, the opener or fronter would make an initial telephone call to a timeshare owner in order to entice him to sell his timeshare to the company. Co-conspirators directed the openers to solicit only timeshare owners who resided out of state to minimize in-person complaints. The openers were directed to represent that the company intended to purchase the timeshare and had the financial ability to make the purchase. Once the timeshare owner's interest was peaked, the openers would refer the call to a "closer."

5. T.M.O., F.D., and other co-conspirators caused the hiring of telemarketers to function as closers. The closers, including defendants **JAMES MICHAEL TOMASSO** and **WENSLEY ROBIN MCFARLANE,** were more highly skilled telemarketers, who were responsible for closing

the deal with the timeshare owner. The closers negotiated the purported purchase price of the timeshares and informed the owners that they would have to pay advanced fees in connection with the sale. The closers falsely represented that the advanced fees were to be used to cover the cost of title searches and other sale related expenses. Initially, the closers represented that actual title companies were conducting the title searches, when in fact they were not. When a title company learned that its name was being used by the closers, defendant **TOMASSO** and a co-conspirator incorporated Royal Title Services and falsely claimed that Royal Title Services was now conducting title searches for the company. In truth, Royal Title Services was a dummy company which conducted no real business.

6. In all instances, the closers promised the timeshare owners that the advanced fees would be held in escrow for approximately thirty days and refunded to them at the closing. In truth, T.M.O., F.D. and other co-conspirators never established any escrow accounts, never verified any timeshare titles, and never returned any of the advanced fees to timeshare owners.

7. The closers would also routinely use fictitious names. To lend an air of legitimacy to their pitches, defendants **TOMASSO** and **MCFARLANE**, as well as co-conspirators, would falsely identify themselves as the "Director of Sales." Closers also re-contacted victims and offered to purchase unused banked weeks, that is, weeks owed to the timeshare owner by the timeshare. This purported purchase also required an additional advanced fee. Although T.M.O., F.D. and other co-conspirators collected advanced fees in connection with the purported purchase of banked weeks, they never actually purchased any banked weeks and failed to return any of the advanced fees.

8. After the company changed names, victim timeshare owners were occasionally re-contacted by certain closers. Using the new company name, the closers falsely claimed that the new

company had taken over the old one and for an additional advanced fee the new company would go forward with the purchase. As an inducement, victims were falsely told that they would be credited with the previous fees they had paid at the time of the new closing. No such closings ever occurred.

9. To further the scheme, members of the conspiracy completed contracts specifying the purchase price, time of closing and required fees to be paid by the victim. Generally, the co-conspirators would send the contracts by United States mail to the victims, with directions to return the signed contracts along with their checks for the advanced fees to the company. On some occasions, the contracts were sent to the victims by e-mail or facsimile. The victims were directed to send the advanced fees to a mailbox drop located in Boca Raton, Florida, rented by the conspirators. Upon receipt, the co-conspirators deposited the victims' checks into the corporate accounts.

10. In addition to his role as a closer, defendant **WENSLEY ROBIN MCFARLANE** also worked as an office manager at the boiler room. He served as an intermediary between the telemarketers and those who set up the scheme. **MCFARLANE** took the lead sheets, with notes, from the closers to T.M.O. Co-conspirator T.M.O., who maintained the records of the transactions, was responsible for reviewing the sales and ultimately calculating the monies due to each of the telemarketers. T.M.O., a signatory on each of the company bank accounts, issued checks to the telemarketers as payment for their split. Approximately 50% of the fees were paid to the telemarketers; the remainder was split between T.M.O. and F.D.

11. Defendant **NICHOLAS CHARLES HIGGINS** originally worked as an opener. However, when he was unable to successfully perform, he was reassigned to work as the office administrative assistant. **HIGGINS** sometimes signed the sales contracts using the fake names of

the closers in order to complete the contracts. He even signed a contract in his true name. **HIGGINS** was responsible for answering telephone complaint calls from the victims. When a victim would ask to speak to their closer about the status of the delayed "sale," in order to stall the victims, **HIGGINS** would falsely tell them that the closer was unavailable. **HIGGINS** and another co-conspirator developed a revised contract which was sent to victims. Defendant **HIGGINS** was also responsible for faxing and e-mailing contracts to many victims. Defendant **HIGGINS** was a signatory on one of the boiler room bank accounts. **HIGGINS** was one of only two people authorized to retrieve mail from the mail drop. After he got the mail, he delivered it to T.M.O. or a designated co-conspirator. The mail box company employees had agreed not to place the mail in the mailbox, holding it aside for **HIGGINS,** in order to avoid law enforcement scrutiny. They also alerted **HIGGINS** as to police inquiries about the mail. **HIGGINS**, in turn, was tasked with paying those employees, in cash, for the "extra services" rendered. **HIGGINS** also routinely cashed checks for the co-conspirators against his own account.

12. During the course of the conspiracy, the defendants and their co-conspirators defrauded more than 1,000 victims throughout the United States and collected more than $3 million in advanced fees for sales which never occurred.

All in violation of Title 18, U.S.C. § 1349.

_____
WIFREDO A. FERRER
UNITED STATES ATTORNEY

_____
KERRY S, BARON
ASSISTANT UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-80157-CR-RYSKAMP / HOPKINS

UNITED STATES OF AMERICA

vs.

**CERTIFICATE OF TRIAL ATTORNEY***

WENSLEY ROBIN MCFARLANE,
 a/k/a Collin Finnigan,
JAMES MICHAEL TOMASSO,
 a/k/a Jimmy Johnson,
 a/k/a James Michaels,
 a/k/a William Davis, and
NICHOLAS CHARLES HIGGINS,
 a/k/a Jordan Markum,
 a/k/a Nicky Blue,
          **Defendants.**
_____/

**Superseding Case Information:**

**Court Division:** (Select One)

___ Miami    ___ Key West
___ FTL    _X_ WPB    ___ FTP

New Defendant(s)          Yes ___  No ___
Number of New Defendants  ___
Total number of counts    ___

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter:     (Yes or No)     _No_
   List language and/or dialect    _____

4. This case will take   _3_   days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)                          (Check only one)
   I    0 to 5 days       _3_      Petty      ___
   II   6 to 10 days      ___      Minor      ___
   III  11 to 20 days     ___      Misdem.    ___
   IV   21 to 60 days     ___      Felony     _X_
   V    61 days and over  ___

6. Has this case been previously filed in this District Court? (Yes or No)  _No_
   If yes:
   Judge: _____    Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter? (Yes or No)  _Yes_
   If yes:
   Magistrate Case No.              11-8253-JMH
   Related Miscellaneous numbers:   N/A
   Defendant(s) in federal custody as of  7/7/11 = Wensley; 7/25/11 = Tomasso
   Defendant(s) in state custody as of    _____
   Rule 20 from the _____ District of _____

   Is this a potential death penalty case? (Yes or No)  _No_

7. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?   ___ Yes   _X_ No

8. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?   ___ Yes   _X_ No

                                        _____
                                        KERRY BARON
                                        ASSISTANT UNITED STATES ATTORNEY
                                        Court No. A5500040

*Penalty Sheet(s) attached                                      REV 4/8/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

Defendant's Name: **WENSLEY ROBIN MCFARLANE, a/k/a Collin Finnigan**

Case No: 11-80157-CR-RUSKAMP/HOPKINS

Count #: 1

Conspiracy to Commit Mail and Wire Fraud.

18 U.S.C. § 1349

* **Max.Penalty**:   20 years' imprisonment; $250,000.00 fine; 3 years Supervised Release and Restitution

\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: <u>JAMES MICHAEL TOMASSO, a/k/a Jimmy Johnson, a/k/a James Michaels, a/k/a William Davis</u>

Case No: <u>11-80157-CR-RYSKAMP/HOPKINS</u>

Count #: 1

<u>Conspiracy to Commit Mail and Wire Fraud.</u>

<u>18 U.S.C. § 1349</u>

* **Max.Penalty**:        20 years' imprisonment; $250,000.00 fine;
                          3 years Supervised Release and Restitution

\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:** <u>NICHOLAS CHARLES HIGGINS, a/k/a Jordan Markum,</u>
<u>          a/k/a Nicky Blue          </u>

Case No: <u>11-80157-CR- RUSKAMP/HOPKINS</u>

Count #: 1

<u>Conspiracy to Commit Mail and Wire Fraud.                                      </u>

<u>18 U.S.C. § 1349                                                                </u>

* **Max.Penalty:**        20 years' imprisonment; $250,000.00 fine;
                          3 years Supervised Release and Restitution

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**